IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

**BEONICA V. GASKILL-CLAYBORN**                                              **PLAINTIFF**

**V.**                  **NO. 1:20-CV-128-DMB-RP**

**MIGHTY OAKS CHILD DEVELOPMENT**
**CENTER, LLC and UNEMPLOYMENT**
**COMPENSATION BOARD OF APPEAL,**
**Commonwealth of Pennsylvania**                  **DEFENDANTS**

## ORDER

Following a default judgment on liability against Mighty Oaks Child Development Center, LLC, Beonica V. Gaskill-Clayborn's Title VII claims against Mighty Oaks are before the Court for a determination of damages.

## I
## Procedural History

On June 18, 2020, Beonica V. Gaskill-Clayborn filed a complaint in the United States District Court for the Northern District of Mississippi against Mighty Oaks Child Development Center, LLC, and the Unemployment Compensation Board of Appeal of the Commonwealth of Pennsylvania. Doc. #1. The complaint alleged that Mighty Oaks violated Title VII by failing to accommodate Gaskill-Clayborn's religion and by terminating her due to her religion. *Id.* at PageID 6–7. The complaint also sought review of the Unemployment Compensation Board's decision that Gaskill-Clayborn was not entitled to unemployment benefits. *Id.* at PageID 7. As relief, Gaskill-Clayborn sought (1) "[a]n award of back pay and any lost unemployment benefits;" (2) "front pay and/or reinstatement as appropriate;" (3) "an injunction curing the violations alleged … and prohibiting any future similar violations;" (4) "any other equitable relief as the court deems appropriate;" (5) "compensatory damages for emotional distress and any other non-pecuniary

harms flowing from the actions alleged;" (6) "consequential damages and any other pecuniary harms flowing from the unlawful acts complained of;" (7) "punitive damages commensurate with the misconduct and necessary to deter violations of the law;" (8) "notice given to all employees regarding the violations … and notifying such employees of the order entered proscribing any future similar violations;" (9) pre- and post-judgment interest; (10) attorney fees; (11) costs; and (12) "any other relief available under any applicable principle in law or equity." *Id.* at Page ID 7–8.

Gaskill-Clayborn moved for entry of a default against Mighty Oaks on October 22, 2020. Doc. #10. The Clerk of Court entered a default against Mighty Oaks on October 27, 2020. Doc. #11. Two days later, Gaskill-Clayborn moved for a default judgment against Mighty Oaks. Doc. #12. On November 23, 2020, the Court denied the motion without prejudice because the motion was not accompanied by a memorandum brief in violation of the Court's local rules, and because the motion did not "mention the claims in the complaint or explain why a default judgment is procedurally justified." Doc. #14 at 2. One week later, Gaskill-Clayborn filed a second motion for default judgment against Mighty Oaks. Doc. #16.

On December 15, 2020, pursuant to Federal Rule of Civil Procedure 41, Gaskill-Clayborn voluntarily dismissed her claims against the Unemployment Compensation Board. Doc. #19. On January 13, 2021, the Court granted Gaskill-Clayborn's motion for default judgment against Mighty Oaks and advised that "[a] hearing on damages will be set by separate notice." Doc. #20 at 6–7.

The Court held an evidentiary hearing on damages on February 26, 2021. Doc. #26. Both Gaskill-Clayborn and her husband Marcus Clayborn testified. Doc. #27. Gaskill-Clayborn also introduced four exhibits: (1) pay stubs from Mighty Oaks; (2) employment search records; (3) a

handwritten estimate of back pay; and (4) medical records. Doc. #28. After the hearing, in response to the Court's directive that she file "a post-hearing brief which details the type and amount of damages to which she claims entitlement, and includes authority supporting each request," Doc. #29, Gaskill-Clayborn timely filed a post-hearing brief. Doc. #34.[1]

## II
## Damages Standard

Following a default judgment, "[a] plaintiff bears the burden of proving his damages." *Niemi v. Lasshofer*, 770 F.3d 1331, 1355 (10th Cir. 2014); *see Flynn v. People's Choice Home Loans, Inc.*, 440 F. App'x 452, 457 (6th Cir. 2011) (after default judgment, "the burden of establishing damages rest[s] squarely and solely" on plaintiff). Regarding damages, "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c). Therefore, "the relief prayed for in a complaint defines the scope of relief available on default judgment." *United States v. Giles*, 538 F. Supp. 2d 990, 994 (W.D. Tex. 2008); *see Silge v. Merz*, 510 F.3d 157, 160 (2d Cir. 2007) (Rule 54(c) "permits neither increases in kind or in amount from the figure specified in the demand for judgment") (cleaned up). If the requested relief does not differ in kind from, or exceed in amount, what is demanded in the pleadings, the Court must then determine "if the requested relief is appropriate based on governing law." *Fagan v. Lawrence Nathan Assocs., Inc.*, 957 F. Supp. 2d 784, 801 (E.D. La. 2013).

## III
## Analysis

In her complaint, Gaskill-Clayborn sought back and front pay; injunctive relief; compensatory, consequential, and punitive damages; pre- and post-judgment interest; attorney

---

[1] Gaskill-Clayborn filed her post-hearing brief on the March 11, 2021, deadline set by the Court. Docs. #29, #34. The Clerk of Court instructed her to refile the brief because the exhibits were not denominated by both an exhibit letter or number and a meaningful description. Gaskill-Clayborn did so on March 17, 2021. Doc. #35.

fees, and costs. Doc. #1 at PageID 7–8. In her post-hearing brief, Gaskill-Clayborn argues she is entitled to (1) $32,660 in back pay; (2) $41,600 in front pay; (3) $50,000 in compensatory damages; and (4) $14,273 in costs, including attorney fees. Doc. #35 at 1.

### A. Back Pay

Gaskill-Clayborn argues that she is entitled to $32,660 in back pay based upon "a rate of four hundred and sixty ($460) per week for seventy-one weeks."[2] Doc. #35 at 3–4.

For claims brought under Title VII, after a court finds that a defendant "intentionally engaged in … an unlawful employment practice charged in the complaint," the court may "order such affirmative action as may be appropriate," including back pay. 42 U.S.C. § 2000e-5(g)(1). "[B]ack pay under Title VII is an equitable, or 'make whole,' remedy. As such, its purpose is to place the plaintiff in the position that she would have been in but for the defendant's illegal conduct." *Overman v. City of East Baton Rouge*, 656 F. App'x 664, 671 (5th Cir. 2016) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 419 (1975)).

Gaskill-Clayborn submitted four pay stubs reflecting that she worked 96.04 hours from August 16, 2019, to August 29, 2019; 84.76 hours from September 14, 2019, to September 27, 2019; 80.44 hours from September 28, 2019, to October 11, 2019; and 91.30 hours from October 16, 2019, to October 29, 2019. Doc. #30. All four pay stubs reflect a rate of $10 per hour. *Id.* Gaskill-Clayborn's hearing testimony confirmed her pay rate and that the pay stubs are a fair representation of what she was paid at Mighty Oaks.

On average, based on the pay stubs, Gaskill-Clayborn was paid for 44 hours each week at a rate of $10 per week, yielding a weekly total of $440. For 71 weeks, that amounts to a total of

---

[2] Seventy-one weeks is Gaskill-Clayborn's estimate of the length of time between her termination on November 4, 2019, and the submission of her post-hearing brief on March 11, 2021. Doc. #35 at 3.

4

$31,240.³  Thus, the Court determines that Gaskill-Clayborn is entitled to $31,240 in back pay.

### B.  Front Pay

Rather than seeking reinstatement, Gaskill-Clayborn "asks that this Court award her two years of front pay" in the amount of $41,600.⁴  Doc. #35 at 5.

The United Supreme Court held in *Pollard v. E.I. du Pont de Nemours & Co.* that Title VII authorized front pay, which "is simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement."  532 U.S. 843, 846 (2001). "Calculations of front pay cannot be totally accurate because they are prospective and necessarily speculative in nature."  *Jackson v. Host Int'l, Inc.*, 426 F. App'x 215, 223 (5th Cir. 2011) (quoting *Reneau v. Wayne Griffin & Sons, Inc.*, 945 F.2d 869, 870 (5th Cir. 1991)).  Because of this "speculative character," district courts have "wide latitude" in determining a front pay award. *Downey v. Strain*, 510 F.3d 534, 544 (5th Cir. 2007).  However, "such awards must be carefully crafted to avoid a windfall to the plaintiff."  *Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 491 (5th Cir. 2007).

There are several factors a court should consider in determining the amount of a front pay award, including "(1) the length of prior employment, (2) the permanency of the position held, (3) the nature of the work, (4) the age and physical condition of the employee, (5) possible consolidation of jobs, and (6) the myriad other non-discriminatory factors which could validly affect the employer/employee relationship."  *Downey*, 510 F.3d at 544.

---

³ Back pay may be awarded until the date damages are settled, which is usually the date of judgment or the date the plaintiff obtains similar employment.  *See Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 483 & n.5 (5th Cir. 2007) ("[B]ack pay accrues from the date of the commencement of the discriminatory course of conduct causing financial loss until the date damages are settled.") (internal quotation marks omitted).  However, Gaskill-Clayborn only requests damages for the 71 weeks between her termination and the submission of her post-hearing brief.

⁴ Gaskill-Clayborn reached this amount based on her $10 hourly rate for 40 hours per week for the full two-year time frame.  Doc. #35 at 5.

Gaskill-Clayborn testified that she worked for Mighty Oaks from August 2, 2019, until November 4, 2019; after her termination she has been unable to find similar work; and, as an alternative teacher originally from Pennsylvania, she would have to return to school to obtain the same credentials she held in Pennsylvania. Additionally, Gaskill-Clayborn stated that she would not feel comfortable returning to work at Mighty Oaks. Under these circumstances, the Court finds that an award of front pay is appropriate. *Spangler v. Colonial Ophthalmology*, 235 F. Supp. 2d 507, 509 (E.D. Va. 2002) (awarding one year of front pay in lieu of reinstatement following default judgment). However, during the hearing, Gaskill-Clayborn testified that her family originally planned to stay in Mississippi "for a year" and afterwards were "due to go back" to Pennsylvania. Given that Gaskill-Clayborn's intent to return to Pennsylvania after a year implies that she did not intend to work at Mighty Oaks for more than one year, the Court finds that an award for two years of front pay would result in a windfall to her. Rather, the Court will award Gaskill-Clayborn front pay for one year in the amount of $20,800.

### C. Compensatory Damages

Gaskill-Clayborn asks for $50,000 in compensatory damages based on the testimony of both herself and her husband that her termination at Mighty Oaks caused her to "lose hair, lose her appetite, lose weight, and have familial trouble with her husband and children;" "incur late fees and credit card debt to pay her bills;" and suffer a miscarriage in early 2020 that she believes was "caused by her work-related stress." Doc. #35 at 2.

"In the Civil Rights Act of 1991, Congress expanded the remedies available to [Title VII plaintiffs] by permitting … the recovery of compensatory and punitive damages." *Pollard*, 532 U.S. at 848 (citing 42 U.S.C. § 1981a(a)(1)).

> The amount of compensatory damages awarded under § 1981a for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of

6

enjoyment of life, and other nonpecuniary losses," and the amount of punitive damages awarded under § 1981a, however, may not exceed the statutory cap set forth in § 1981a(b)(3). The statutory cap is based on the number of people employed by the respondent.

*Id.* Under § 1981a(b)(3), the statutory cap for an employer with more than 14 and fewer than 100 employees is $50,000.[5]

"Compensable emotional distress may manifest itself as sleeplessness, anxiety, stress, depression, marital strain, humiliation, emotional distress, loss of self esteem, excessive fatigue, or a nervous breakdown, and physical manifestations may include ulcers, gastrointestinal disorders, hair loss, or headaches." *E.E.O.C. v. WC&M Enters., Inc.*, 496 F.3d 393, 402 (5th Cir. 2007). "A claimant's testimony, without more, may support an award of compensatory damages for emotional distress." *Id.*; *see Johnson v. Watkins*, 803 F. Supp. 2d 561, 591 (S.D. Miss. 2011) (collecting cases).

At the hearing, Marcus testified that after his wife's termination, she was "down" and "real stressed," she suffered a miscarriage, and her termination was a "strain" on the entire family because the couple was no longer able to share responsibility for paying bills and incurred "one or two late fees"[6] as a result. During her testimony, Gaskill-Clayborn stated that being terminated made her feel "violated and very sad," she stressed about paying her half of the bills and whether rent would be paid, she lost her appetite and some of her hair, and had trouble sleeping. She also testified that she believes a miscarriage she suffered in January 2020 occurred because "the stress that [she] was under took a toll on [her] body" and impacted her ability to care for herself.

As to the miscarriage, beyond the conclusory testimony offered at the hearing by her and

---

[5] The complaint alleged that Mighty Oaks "employed fifteen or more employees." Doc. #1 at 2. Gaskill-Clayborn represents that Mighty Oaks "had fewer than one hundred employees at the time of [her] employment." Doc. #35 at 3.

[6] No proof of such late fees was offered during the hearing.

7

her husband, Gaskill-Clayborn has failed to provide any evidence causally linking the miscarriage to her termination from Mighty Oaks. *See Barnes v. Anderson*, 202 F.3d 150, 160 (2d Cir. 1999) ("[A] miscarriage is the sort of complex injury for which expert medical evidence of causation is required."); *see also Garcia v. Green*, No. 17-8126, 2019 WL 8972808, at *6 (E.D. La. Jan. 11, 2019) ("Miscarriages can be caused by a wide array of circumstances, and the cause of a particular miscarriage is beyond plaintiff's or any other lay person's ability to diagnose."). Thus, the Court gives such testimony little to no weight in determining compensatory damages.

Based on the other evidence presented, however, the Court finds that Gaskill-Clayborn suffered some degree of emotional distress sufficient to justify an award of compensatory damages. *See Miniex v. Houston Hous. Auth.*, 400 F. Supp. 3d 620, 658–62 (S.D. Tex. 2019) (discussing Fifth Circuit cases where plaintiff's own testimony about experiencing, among other things, depression, sleeplessness, and weight loss supported emotional damage awards). But the Court declines to award the statutory maximum based solely on the testimony of Gaskill-Clayborn and her husband. Rather, the Court concludes that an award of $20,000 in compensatory damages is appropriate under the circumstances.

### D. Fees and Costs

Gaskill-Clayborn seeks an award of $14,273 in costs, including attorneys' fees. Doc. #35 at 7. This total is based on (1) 23.5 hours of work performed by Lead Attorney and Senior Partner Joel Dillard at an hourly rate of $318; (2) 32 hours of work by Associate Attorney Jay Kucia at an hourly rate of $200 per hour; and (3) the $400 filing fee. *Id.* at 7–8. Gaskill-Clayborn attached declarations from both Kucia and Dillard regarding their experience, hourly rate, and time spent on the case. Docs. #35-2, #35-3. She also submitted the declarations of three Mississippi attorneys regarding the reasonableness of the fee rates; her legal services agreement; and a bill of costs.

Docs. #35-3 to #35-7.

Under Title VII, "the court, in its discretion, may allow the prevailing party … a reasonable attorney's fee (including expert fees) as part of the costs." 42 U.S.C. § 2000e-5(k). "[A] prevailing plaintiff in a civil rights action is presumptively entitled to reasonable attorney's fees, unless a showing of special circumstances is made that would deem such an award unjust." *Dean v. Riser*, 240 F.3d 505, 508 (5th Cir. 2001). This rule applies where the plaintiff is the prevailing party due to a default judgment. *Deutsh v. Jesus Decerra, Inc.*, 668 F. App'x 569, 571 (5th Cir. 2016) (citing *Dean*, 240 F.3d at 508 to hold that a plaintiff who obtained default judgment on ADA claims was presumptively entitled to attorney's fees and costs).

In determining a reasonable attorney's fee award, "the district court should begin by calculating the lodestar: the reasonable hours expended multiplied by a reasonable rate. The district court may then determine whether any other considerations counsel in favor of enhancing or decreasing the lodestar." *Combs v. City of Huntington*, 829 F.3d 388, 394–95 (5th Cir. 2016). This includes consideration of the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974).[7] *Gurule v. Land Guardian, Inc.*, 912 F.3d 252, 257 (5th Cir. 2018). There is a "strong presumption that the lodestar represents a sufficient fee." *Combs*, 829 F.3d at 394 (internal quotation marks omitted).

> "[R]easonable" hourly rates are to be calculated according to the prevailing market rates in the relevant community. Further … the burden is on the applicant to produce satisfactory evidence that the requested rates are in line with those

---

[7] The *Johnson* factors are:

> (1) the time and labor required to represent the client or clients; (2) the novelty and difficulty of the issues in the case; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney; (5) the customary fee charged for those services in the relevant community; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Gurule v. Land Guardian, Inc.*, 912 F.3d 252, 257 n.3 (5th Cir. 2018).

prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.

*McClain v. Lufkin Indus., Inc.*, 649 F.3d 374, 381 (5th Cir. 2011) (cleaned up). "In addition, plaintiffs seeking attorney's fees are charged with the burden of showing the reasonableness of the hours billed and, therefore, are also charged with proving that they exercised billing judgment." *Saizan v. Delta Concrete Prods. Co.*, 448 F.3d 795, 799 (5th Cir. 2006).

### 1. Reasonable rate

The declarations of the three Mississippi attorneys submitted by Gaskill-Clayborn support Dillard's $318 hourly fee, based on his approximately twelve years of experience. *See* Docs. #35-3 to #35-5. However, none of these declarations address the reasonableness of Kucia's fee. In his declaration, Kucia relies on three Mississippi district court decisions[8] to support "a $200 loadstar rate for a new associate attorney." Doc. #35-1 at 1. This Court has previously approved "a $385 hourly rate for … an attorney with twenty years of experience; … a $285 hourly rate for … an attorney with four years of experience; and … a $150 hourly rate for … a paralegal." *Mass. Mut. Life Ins. Co. v. Williamson*, No. 4:15-CV-166, 2020 U.S. Dist. LEXIS 4318, at *4–5 (N.D. Miss. Jan. 10, 2020). As Dillard's rate is supported by the declarations, Kucia's rates are supported by the case law cited in the brief, and both rates are within the ranges previously approved by this Court,[9] the Court concludes that these rates are reasonable.

### 2. Reasonable hours

Those seeking attorney's fees must "prov[e] that they exercised billing judgment" which

---

[8] Kucia relies on *Mass. Mut. Life Ins. Co. v. Williamson*, No. 4:15-cv-166, at Doc. #132 (N.D. Miss. Jan. 10, 2020); *Bankers Ins. Co. v. Ace Constr. Co.*, No. 1:15CV420, 2016 WL 7335643 (S.D. Miss. Dec. 16, 2016); and *Multiplan, Inc. v. Holland*, No. 1:14CV315, 2020 WL 1128202 (S.D. Miss. Mar. 6, 2020).

[9] "[T]rial courts are considered experts as to the reasonableness of attorney's fees." *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004).

"requires documentation of the hours charged and of the hours written off as unproductive, excessive, or redundant." *Saizan*, 448 F.3d at 799. "The proper remedy for omitting evidence of billing judgment does not include a denial of fees but, rather, a reduction of the award by a percentage intended to substitute for the exercise of billing judgment." *Id.*

As an initial matter, Kucia's request will be reduced by one hour for work performed on the "second motion for default judgment." *See* Doc. #35-1 at PageID 213. This Court denied Gaskill-Clayborn's first motion for default judgment for failure to comply with the Local Rules. Doc. #14 at 2. The Court declines to reward an attorney for work necessitated by his own failure to comply with applicable procedural rules.[10] *See McClain*, 649 F.3d at 381 ("Charges for excessive, duplicative, or inadequately documented work must be excluded.").

Although both Dillard and Kucia assert that "[a]s an exercise in billing judgment, [they] do not bill for activities taking less than ten minutes,"[11] there is no *documentation* of the hours written off. The Fifth Circuit has held that sworn statements similar to those here were insufficient to meet a fee applicant's burden to demonstrate that it exercised billing judgment. *See Walker v. U.S. Dep't of Hous. & Urb. Dev.*, 99 F.3d 761, 769 (5th Cir. 1996) ("[T]here is no record of any such billing judgment, as the plaintiffs allege that they wrote off hours before recording them."). Accordingly, the Court will impose a ten percent reduction to the lodestar.

### 3. Fee calculation

Based on Dillard's 23.5 hours of work at a $318 hourly rate and Kucia's adjusted 31 hours of work at a $200 hourly rate, the Court derives a $13,673 lodestar amount. Applying the ten percent reduction for a lack of documentation of billing judgment, the Court arrives at an award

---

[10] "Attorneys practicing before the district courts of Mississippi are charged with the responsibility of knowing the Local Rules …." L.U. Civ. R. pmbl.

[11] Doc. #35-1 at ¶ 8; Doc. #35-2 at ¶ 13.

11

of $12,305.70. The Court has considered the *Johnson* factors not considered in the lodestar analysis[12] and finds that they do not favor further adjustment of the lodestar.[13]

Finally, Gaskill-Clayborn is also entitled to recover the $400 filing fee. *See U.S. E.E.O.C. v. United Bible Fellowship Ministries, Inc.*, No. 4:13-CV-2871, 2015 WL 13649825, at *5 (S.D. Tex. May 19, 2015) (collecting authorities).

### E. Summary

The Court will award Gaskill-Clayborn $31,240 in back pay; $20,800 in front pay; $20,000 in compensatory damages; $12,305.70 in attorneys' fees; and $400 for the filing fee. Thus, Gaskill-Clayborn's total award is $84,745.70.

## IV
## Conclusion

Based on the above, Gaskill-Clayborn is awarded a total $84,745.70 on her Title VII claims against Mighty Oaks.

**SO ORDERED**, this 22nd day of September, 2021.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**

---

[12] *Black v. SettlePou, P.C.*, 732 F.3d 492, 502 (5th Cir. 2013) ("The lodestar may not be adjusted due to a *Johnson* factor that was already taken into account during the initial calculation of the lodestar.").

[13] *See Torres v. SGE Management, L.L.C.*, 945 F.3d 347, 354 (5th Cir. 2019) (district court need not engage in "a lengthy analysis of each [*Johnson*] factor" as long as it has "articulated and clearly applied the criteria").